Memorandum of Decision
On July 1, 1997, the Department of Children and Families (DCF) filed petitions to terminate the parental fights of Lynda S. and Alan G. to their daughter Jacqueline G., and to terminate the parental rights of Lynda S. and Kevin S. to their daughters Anna S. and Kristina S. A consolidated trial of the termination petitions took place on October 19 and 20, 1998. For the reasons stated below, the Court grants the termination petitions.
FACTS
The Court finds the following facts and credits the following evidence.
A. The Parents
Jacqueline G. was born on May 30, 1989. Her father, Alan G., moved out-of-state about six months after her birth. DCF attempted to locate him by publishing notice in a newspaper in Florida, where DCF suspected he was located, and by sending a CT Page 12464 letter to a possible address. He did not respond and did not appear at trial.
Jacqueline's mother, Lynda S., was not married to Alan G., although she had been married twice before. In August, 1990, the mother married Kevin S., who had just been honorably discharged from the Navy after ten years of service and completion of a college education. Kevin S. became a step-father to Jacqueline and, as a practical matter, became her father.[2] The couple moved to Indiana in 1992, in part because the father had family there. On Thanksgiving day, November 26, 1992, the couple celebrated the birth of their first child together, Anna S.
By 1993, problems in the marriage had surfaced. The mother, who had a long history of substance abuse and several criminal convictions, began partying and abusing substances. While the father was at work, the mother would go out and leave the children at the home of other people, including strangers. This situation led the county Division of Family and Children to take custody of the children, originally for a few days and then a second time for several months.
As the marriage deteriorated, the father began to drink on weekends. The couple filed for bankruptcy because the mother had accumulated debt through credit card use and writing bad checks. The mother became pregnant and the father suspected that the mother had a boyfriend. In 1994, the father lost his job.
The father filed for divorce and the couple decided to separate. The father thought the children would be better off with the mother in Connecticut, where she had family. The father intended to make a home for the children in Indiana and eventually bring them back.
The mother returned to Connecticut with the children in April, 1994. In May, 1994, DCF, which had been involved with the mother in 1990 due to her substance abuse and neglect, reopened its case. In June, 1994, DCF filed a petition for neglect. That summer, DCF placed Jacqueline and Anna in foster care.
At about that time, Anna was hospitalized for a stomach problem and DCF and the father established contact. The father elected not to return to Connecticut for a visit because he had just started a new job. The father expressed his desire to have the children returned to him, but reluctantly agreed with DCF's CT Page 12465 plan to reunite the children with their mother. The father did, however, attempt to maintain contact with the children by calling the mother. The father also sent money to the mother for the support of the children.
On August 17, 1994, Kristina S. was born. She tested positive for cocaine. The father initially denied paternity of Kristina because the mother had a boyfriend in Indiana. Kristina lived with her mother for the first month of her life in a residential substance abuse program. After the program discharged the mother for using substances and failing to give a drug screen, Kristina entered the foster home of her two sisters on a voluntary placement. Because that foster home could not accommodate all three children, DCF transferred them in late 1994 to another foster home, where they have remained to the present time. On December 13, 1994, all three children were committed to DCF as uncared for due to their lack of housing and supervision and the mothers substance abuse.
Pursuant to court-imposed expectations and a March, 1995 service agreement, DCF referred the mother to eleven different treatment programs, primarily for substance abuse. The mother completed only one of these programs and then relapsed five days later. The mother did not follow through with mental health therapy and was not compliant with medication. DCF arranged to transfer the mother's phone calls to the foster home to save on long distance charges, but the mother was inconsistent in taking advantage of this opportunity. DCF provided bus tokens or a close neutral site for visits with the children, but the mother's visits were sporadic. On occasion, the mother promised the children that she would take them out to lunch or to a park and then failed to keep her promise. In March, 1996, the mother admitted to using substances instead of attending a visit.
Because of this record, DCF canceled the mother's visits after June 11, 1996, although DCF still offered to place phone calls. In November, 1996, DCF attempted to set up a meeting with the mother to discuss visitation. The mother missed both the originally scheduled meeting and a rescheduled meeting. When a DCF worker called the mother's residence concerning her absence at the rescheduled meeting, the worker heard loud music in the background. Thereafter DCF canceled all visits and phone calls. The mother did send some correspondence to her children during this period. CT Page 12466
In February, 1997, the mother was arrested for failure to appear on 1994 violation of probation charges, which probation arose from her 1990 conviction for possession of narcotics. In March, 1997, the mother received a one year prison sentence on the violation of probation. The mother's current whereabouts are unknown. The mother failed to appear for this trial.
Throughout the period from 1994 to 1996, the father had maintained phone and mail contact with the three children. Because the father maintained a desire to have the children returned, DCF requested the county service agency in Indiana to conduct a home study. That study, completed on January 5, 1995, recommended with some reservations that the father's home be considered a placement for the children. Paternity testing confirmed in early 1996 that Kevin S. was the father of Kristina. Because of the difficulties that DCF was having with the mother during this time period, DCF turned to the father as a possible resource. In the spring, 1996, DCF and the father entered into two service agreements in which, among other things, DCF agreed to pay one-half of the fathers transportation costs to Connecticut for visitation. The father visited in February or March and again in May, 1996.
During his first 1996 visit to Connecticut, the father disclosed to DCF for the first time that he had a drinking problem. In fact, the father had been arrested for and convicted of drunk driving three times between October, 1994 and the spring, 1996 visit. The father had continued to drink during this time period even though he knew he was under scrutiny by the Connecticut and Indiana child placement authorities. The fact that the father squandered money on alcohol, along with other financial difficulties and the uncertainty over whether he was Kristina's father, explained the father's failure to visit the children in 1995.
DCF nonetheless arranged for visits to take place in July and September, 1996. The father did not make the July visit because he could not get vacation time from his job and could not afford to lose pay. In August, the father was arrested for drunk driving for the fourth time and placed on home detention. In November, 1996, the father was sentenced to twenty-six months in prison. In a report compiled around the time of sentencing, the Indiana placement agency noted that the father had failed to disclose his alcohol problem at the time of the first home study and recommended against placement of the children with the father. On CT Page 12467 July 1, 1997, DCF filed petitions to terminate all parental rights.
By all accounts, the father became a model prisoner. The prison staff made him a trustee, with the responsibility of assisting the staff with maintenance. Although opportunities for substance abuse counseling were limited, the father completed an AA program and did much reading, talking, and thinking about his alcohol problem. The father maintained weekly mailings to his children and, in return, he received copies of their school work and pictures from the foster parents.
The father was paroled in May, 1998, after serving approximately eighteen months. On parole he completed a comprehensive counseling program and ultimately volunteered to help others. He is now employed in industrial sales and is working part-time with substance abusers. He holds the laudable goal of becoming a licensed substance abuse counselor.
With candor and emotion, the father testified at trial. He acknowledged his past mistakes and was ashamed of them. Commendably, he praised the foster parents for the love and attention they have given the children. Ultimately he admitted that he does not wish to take the girls from the foster parents but just wants to remain a part of their lives.
B. The Children
Jacqueline was almost nine and one-half years old at the time of trial. She has lived in five foster homes. Over the years she has had speech, language, and organizational difficulties. In 1997, a psychologist diagnosed her as having dysthymia or minor depression exacerbated by distress in her life. She has received therapy and counseling. Jacqueline is a quiet girl who finds it difficult to connect with others until she gets to know them well. She is now doing well at home and in school, where she is engaged in cross-country and gymnastics.
Jacqueline has no feelings for or memories of her natural father, Alan G. She has received correspondence from her mother and her step-father, Kevin S., and, through the foster parents, has sent mail back to her stepfather. Jacqueline now understands that, prior to the spring, 1994, the father in her life was Kevin S., but she does not manifest any strong positive feelings for him as a parent. Jacqueline had a strong attachment to her mother CT Page 12468 that was affected by the mothers lack of visitation. She expressed concern to the social worker that her mother would be shot while buying drugs. Jacqueline is bonded with her foster parents and to the foster home, which includes two older, natural children of the foster parents. Jacqueline is also very close to her two step-sisters and often acts out a parentified role.
Anna S. was almost six years old at the time of trial. In April, 1995, Anna had tubes placed in her ears due to chronic ear infections. When initially placed in foster care in Connecticut in 1994, Anna reacted by eating until she vomited, twirling her hair until it fell out, and throwing severe temper tantrums. Anna went into therapy in 1996 and eventually responded well. She is now a bubbly child. Nonetheless, the foster parents still experience difficulty leaving her with someone else, such as a babysitter, because Anna is concerned that her foster parents will not come back.
Anna exhibits a psychological attachment to her foster parents, who have provided security, consistency, and a nurturing environment. She is aware of who her biological parents are, but she does not speak of them. According to the testimony of therapist Sharon Stackpole, the father's contact by mail or even by phone is not as meaningful to a young girl such as Anna as personal visits, of which there have been only two since 1994. Anna has a need for stability and permanency so that her progress is not set back.
Kristina was four years old at the time of trial. She has received speech and language therapy. She is now an engaging, independent child. She has no memories or feelings for her natural parents. She is extremely connected to her foster parents.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1).[3] The Court need not make such a finding, however, "if a court has determined CT Page 12469 at a hearing pursuant to subsection (b) of section 17a-110
[dealing with permanency planning for committed children] that such efforts are not appropriate." Id. DCF concedes that in this case no prior finding formally entered.
As stated above, DCF made reasonable efforts to find Alan G. but could not find him. DCF located the mother and facilitated visits, phone calls, and substance abuse counseling. That these initiatives did not result in the reunification of the mother with her children is entirely the fault of the mother. DCF located the father in Indiana but he initially agreed, albeit reluctantly, to let DCF pursue reunification efforts with the mother. Later on DCF entered into two service agreements with the father, authorized two home studies by Indiana authorities, paid one-half the travel costs of two visits to Connecticut, and offered to pay one-half the cost of additional visits, which the father elected not to make. All told, these efforts were reasonable given the father's interest and location.
 B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. SeeIn re Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3). General Statutes § 17a-112 (c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in § 17a-112 (d).[4] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus July 1, 1997.
DCF in this case has alleged the grounds of 1) abandonment and lack of an ongoing parent-child relationship with regard to Alan G. and Jacqueline, 2) abandonment and failure to rehabilitate with regard to the mother and Jacqueline, and 3) abandonment, failure to rehabilitate, and lack of an ongoing relationship with regard to both parents of Anna and Kristina. DCF alleges that these grounds have existed for more than one year. The Court finds that DCF has proven its allegations by clear and convincing evidence except for the allegations of failure to rehabilitate against the father. CT Page 12470
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
By any definition of abandonment, Alan G. has abandoned his daughter Jacqueline, because he left her when she was six months old and has not been present since then. The mother has also abandoned her three daughters. She last saw them on June 11, 1996. After that, the mother sent her children letters but, because of her own mistakes, lost the right to see and phone them. In March, 1997, the mother was incarcerated and has not shown any significant interest in her children since then.
The father's abandonment of his two natural children took place primarily in 1995 and 1996. While the father did write the children and attempt to phone them during this time period, this sort of contact is not as meaningful to young children as personal visits. The evidence reveals that the father visited only twice during this time period. Indeed, those two visits are apparently the only times that Kristina has ever seen her natural father. It is true that economic realities presented the father with some very difficult choices. But ultimately the father chose to further his employment opportunities and risk losing contact with his children. Further, the father testified that he squandered some of his money on alcohol. Moreover, in 1996, DCF offered to pay half of his travel costs and, through his own choices, the father made himself unavailable for the last two visits.
The father was incarcerated in late 1996 through the end of the adjudicatory period. Although incarceration obviously limits CT Page 12471 the opportunity to maintain contact with one's children, incarceration does not constitute a complete defense to abandonment. See In re Juvenile Appeal (Docket No.10155), 187 Conn. 431, 443 (1982). The father did in fact do what he could while imprisoned in Indiana by sending the children correspondence. But those efforts do not negate his earlier failures. The Court concludes that DCF has proven abandonment by the father.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(C). The statute requires the Court to analyze the parents rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted).
No dispute exists that the Court has previously found the children to have been "uncared for," thus satisfying a statutory prerequisite. The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(C). Because of the requirement that the Court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the Court can consider not only the parent's conduct before the filing of the termination petition, but also the conduct occurring after it.
The mother's completion of at most one out of eleven substance abuse treatment programs speaks volumes about her failure to rehabilitate. In addition, the mother's record during this time period of failure to attend DCF meetings, failure to CT Page 12472 obtain mental health therapy, sporadic visitation and phone contact with her children, violation of probation, and disappearance from this case establishes that she has failed to rehabilitate herself within the meaning of the statute.
The failure to rehabilitate allegation against the father presents a different picture. It is true, as a DCF worker testified, that the father will need more and perhaps continuing therapy to prevent a relapse of his alcoholism and thereby reach the point where he can become a trustworthy, responsible full-time parent. But the statute does not require that the person rehabilitate to the point of becoming a full-time parent; rather, it requires only that the parent reach a position where he can assume a "responsible position" in the children's lives. Further, as mentioned, the fact that the parent needs additional services does not mean he has failed to rehabilitate.
The father in this case has paid his debt to society for his drunk driving. He now has a solid job. He has made progress in recovering from alcoholism. He has a laudable goal of helping others do so. He loves his children but has the maturity to understand that they are in a wonderful foster home. He had a respectful demeanor in court, which reveals that he respects authority generally. For all these reasons, the Court finds that the evidence is not clear and convincing that the father has failed to rehabilitate himself.
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous). 181 Conn. 638, 645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural CT Page 12473 parent." Id. at 646.
The evidence is clear and convincing that Jacqueline has no feelings for or even memories of her natural father, Alan G.[5]
Anna is aware of her biological parents but does not speak of them. The correspondence sent to Anna by her parents has been insufficient to create an ongoing relationship. What was necessary, given Anna's young age, was personal contact. The parents did not supply enough to create a bond. Kristina has no memories or feelings for her natural parents. She has only seen her natural father twice in her life. The Court accordingly finds that DCF has proven all allegations of lack of an ongoing relationship.
4. One Year Requirement
The Court finds that the statutory grounds supporting the termination of parental rights to the children existed for more than one year prior to filing of the petition. Moreover, the Court can waive the one year requirement if it finds "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." Conn. Gen. Stat. § 17a-112 (d)(1). Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent necessary to sustain this decision.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether the State has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interests of the children clearly and convincingly require termination of the parental rights of Alan G. and Lynda S. for all the reasons stated above and below. The most fundamental of these reasons, of course, is that these parents are nowhere to be found.
The father's case requires additional discussion. The father candidly admits that he is not in a position to take the children home to Indiana at the present time but nonetheless seeks to CT Page 12474 maintain a role in their lives. The father suggests that the Court transfer guardianship to the foster parents so that the father can retain some legal rights to the children.
There are several problems with the father's proposal. The first is that the foster parents have not asked for it. The testimony of the foster mother is that she wishes to adopt the three children. There was no evidence that she seeks a guardianship. A guardianship confers on the father the right seek modification or revocation, see In re Juvenile Appeal(85-BC), 195 Conn. 344, 367 (1985), something that the foster parents may not want to contemplate in the years ahead.
Second, the father's argument focuses on his interests and not necessarily on those of the children. The best interests of the children do not favor guardianship. The undisputed testimony is that these children, who have been in from two to five foster homes over the years, need stability and permanency. The prospect of modification or revocation of a guardianship would take away the stability that termination affords. After what these three children have been through, they are entitled to know that they will stay with their foster parents until at least age eighteen. See In re Juvenile Appeal (Anonymous),177 Conn. 648, 668 (1979).
An additional factor is that Kevin S. is not the natural or legal father of Jacqueline. Although, ironically, of the three children, Jacqueline would probably adjust best to contact with Kevin S., because Jacqueline will be ten years old in 1999 and has known Kevin S. the longest, it is not clear that Kevin S. has any standing to oppose termination of the parents' rights to Jacqueline. Further, given the parentified role that Jacqueline has played and the bonds that exist among the three girls, it would not be in the best interests of the children to treat Jacqueline any differently than Anna and Kristina, for whom Kevin S. does have standing. The fact that the evidence strongly compels termination of the parental rights to Jacqueline thus supports the decision to terminate the father's rights to Anna and Kristina.
The Court does not intend to suggest that the father is not deserving of visitation. Even though the father, through his actions and inactions from 1995 to 1997, did much damage to the relationship with his children, the father has made great strides in rehabilitating himself. Visitation cannot be ordered by this CT Page 12475 Court once it terminates parental rights, but the Court can and does strongly encourage the foster parents to allow visitation by Kevin S. This Court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck,209 Conn. 407, 415 (1988).
In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF provided foster care for the children and offered Lynda S. and Kevin S. visitation with accommodations for transportation difficulties. DCF offered Lynda S. counseling for substance abuse problems and facilitated phone calls with the children. DCF considered Kevin S. as a possible resource for the children and accordingly entered into two service agreements and commissioned two home studies. These services were relevant to the needs of the parties and were offered in a timely manner. DCF did not locate Alan G. and therefore could not offer him any services.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
At the time of commitment of the children, the Court approved the following expectations for Lynda S.: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF CT Page 12476 permits, (4) participate in substance abuse counseling at the Boneski program, and (5) no substance abuse. As detailed above, DCF substantially met its obligation to provide assistance. Based on the foregoing discussion, the Court finds that the mother's compliance with these expectations was poor.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children are bonded to their present foster family. Jacqueline is not bonded to Alan G., but does have some bonds with her mother. Anna and Kristina do not have any significant bonds with their natural parents.
5) The age of the child.
Jacqueline is almost nine and one-half, Anna is almost six, and Kristina is four. Jacqueline has lived almost half of her life in foster care and Anna and Kristina have lived most of their lives in foster care. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292 (1983). The Appellate Court has observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." In re Alexander V., 25 Conn. App. 741, 748 (1992). Thus it is not in the best interests of the children to keep them in foster care settings that are legally temporary. The children are entitled to the permanency that termination provides.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that Alan G. and Lynda S. have not been successful in the efforts they have CT Page 12477 made to adjust their circumstances or conditions to facilitate reunification and have not maintained regular contact with their children. Kevin S. has rehabilitated himself significantly, but he does not seek, nor does the best interest of the children favor, reunification with his children.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As stated above, the parent's difficulties are primarily of their own making. Kevin S. did encounter difficult economic circumstances but also squandered money on alcohol, did not take advantage of DCF offers to pay half of his transportation costs, and ultimately decided to further his employment opportunities in Indiana instead of visiting with his children in Connecticut.
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of Jacqueline G. for a termination of parental rights to enter with respect to the mother, Lynda S., and the father, Alan G. and in the best interest of Anna S. and Kristina S. for a termination of parental rights to enter with respect to their mother, Lynda S., and their father, Kevin S. Accordingly, the Court hereby terminates all parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Court also strongly encourages the foster parents to permit contact and visitation by Kevin S. The Commissioner shall file with this Court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman, Judge, Superior Court.